MANTEI v MICHIGAN PUBLIC SCHOOL EMPLOYEES RETIREMENT
SYSTEM AND MICHIGAN PUBLIC SCHOOL EMPLOYEES
RETIREMENT BOARD

Docket No. 228589. Submitted January 15, 2003, at Lansing. Decided April
1, 2003, at 9:00 A.M.

Robert J. Mantei, a retired public school principal who accepted an
at-will position with a personnel-services company to provide
administrative services to his former school district, petitioned the
Bay Circuit Court for judicial review of a decision of the Michigan
Public School Employees Retirement Board that the petitioner was
subject to the earnings limitation set forth in MCL 38.1361 of the
Public School Employees Retirement Act because he was
employed by a reporting unit (his former school district) within the
meaning of the act, and was thus required to reimburse the Michi-
gan Public School Employees Retirement System for compensation
received in excess of the statutory limit. The court, Lawrence M.
Bielawski, J., affirmed the board's decision, concluding that the
board properly applied a 20-point control test to determine that the
petitioner was an employee of his former school district, and his
earnings subject to the limitation set forth in MCL 38.1361. The
petitioner filed an application for leave to appeal, which was
granted by the Court of Appeals.

The Court of Appeals *held*:

1. MCL 38.1361 limits a retirant's retirement allowance when the
retirant "becomes employed by a reporting unit" and earns speci-
fied wages. There is no dispute that the petitioner's former school
district is a "reporting unit" for purposes of § 61. The issue, one of
first impression, is whether a retired public-school principal who
acts as an administrator in a public school pursuant to a contract
with a private sector personnel services company "becomes
employed by" a reporting unit for purposes of § 61.

2. The IRS 20-point control test is not the correct test for deter-
mining whether the petitioner was employed by the school district
because the test's general purpose is to determine whether an indi-
vidual is an employee or independent contractor for income-tax fil-
ing and withholding requirements. Furthermore, the focus of the
20-point control test is control, and the Court of Appeals has
declined to apply the common-law control test in cases not involv-

ing questions of respondeat superior liability. Instead, the test to be applied is the economic-reality test.

3. The economic-reality test considers the totality of the circumstances in light of four basic factors: control of a worker's duties; payment of wages; right to hire, fire, and discipline; and performance of the duties as an integral part of the employer's business. The facts showed that the school district did not control the petitioner, because although contractually bound to follow and implement district rules and policies, the petitioner essentially exercised his independent professional judgment on a daily basis without direct supervision. The petitioner was compensated by the personnel services company, not the school district, and could only be disciplined by the company. Moreover, the contract between the personnel services company and the school district clearly stated that the petitioner was not an employee of the district. Under the totality of the circumstances, the petitioner was not employed by the school district, and thus was not employed by a reporting unit for purposes of § 61.

Reversed.

SCHOOLS — PUBLIC SCHOOL EMPLOYEES RETIREMENT — POSTRETIREMENT EMPLOYMENT — LIMITATION OF EARNINGS AND RETIREMENT ALLOWANCE.

The economic-reality test and its four basic factors: control of a worker's duties; payment of wages; right to hire, fire, and discipline; and performance of duties as an integral part of the employer's business, apply when determining whether a retirant is employed by a reporting unit of the Michigan Public School Employees Retirement System for purposes of limiting the retirant's earnings and reducing the retirement allowance (MCL 38.1361).

*Thrun, Maatsch and Nordberg PC* (by *C. George Johnson*) for the plaintiff.

*Michael A. Cox,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Stephen M. Rideout,* Assistant Attorney General, for the defendants.

Amicus Curiae:

*Brad A. Banasik* for the Michigan School Business Officials and Michigan Association of School Boards.

Before: O'CONNELL, P.J., and GRIFFIN and MARKEY, JJ.

GRIFFIN, J. In this appeal, we address an issue of first impression: whether a retired public-school principal acting as an administrator in a public elementary school pursuant to a contractual arrangement with a private-sector personnel-services company that furnishes qualified administrators and other needed personnel to Michigan schools "becomes employed by a reporting unit," i.e., the school district he serves, for purposes of § 61 of The Public School Employees Retirement Act of 1979 (retirement act), MCL 38.1361. If the retirant is deemed an employee of the school district, the retirant is subject to the retirement act's provision in § 61 limiting earnings and reducing the retirement allowance.

Petitioner Robert J. Mantei, the retirant in question, appeals by leave granted from an order of the circuit court affirming respondents Michigan Public School Employees Retirement System (MPSERS) and Michigan Public School Employees Retirement Board's (the retirement board) decision that petitioner was subject to the earnings limitation of § 61 of the retirement act, because he was "employed by a reporting unit" within the meaning of the retirement act. Pursuant to the court's order, petitioner was required to reimburse the MPSERS for that portion of his pension benefits that exceeded the statutory earnings limitation. We reverse and hold that under the economic-reality test, petitioner was not "employed by a reporting unit" for purposes of § 61 of the retirement act.

I

The following facts, as recited by the circuit court, are not in dispute:

Petitioner had been employed with the Essexville-Hampton Public Schools since August 25, 1967. During said employment, petitioner was promoted to the position of Principal of Hughes Elementary School effective July 1, 1994. Petitioner continued [as] the Principal of Hughes Elementary School until July 1, 1997—i.e., the effective date of his retirement.

It should be noted that at the time of his promotion to the position of Principal of Hughes Elementary School, and in response to certain incentives offered to employees if notification of retirement was provided at least three (3) years in advance, petitioner informed former Superintendent Bob Winters in 1994 that he would be retiring in 1997. At that time, there were no discussions between petitioner and Superintendent Winters regarding any options for petitioner to continue providing services to the school district through any contracted-for service arrangement. Indeed, petitioner had not even considered such an option at that time.

However, in the winter of 1995 or the spring of 1996, petitioner attended a conference where he learned that some retired principals were being employed by private organizations to provide serves [sic] as principals in public schools.

In any event, within one week after retiring as Principal of Hughes Elementary School, petitioner returned to the school district as Principal of Hughes Elementary School under an employment contract with Thumb Educational Services, Inc. [hereinafter "Thumb"]. Apparently, prior to retiring from the school district, petitioner had discussions with Thumb, a Michigan corporation that places administrators and supervisory personnel in Michigan schools. The substance of those discussions related to petitioner's continued employment as a Principal . . . . At that same time, said school district was having discussions with Thumb regarding an experienced administrator to take petitioner's place as Principal of Hughes Elementary School.

. . . petitioner was hired by Thumb and the school district contracted with Thumb for an experienced administrator to become Principal of Hughes Elementary School. As a result, within one week of his retirement from the school district,

petitioner *once again returned to* Hughes Elementary School in the capacity of Principal.

From the 1997-98 school year to present, petitioner has been the Principal of Hughes Elementary School under an at-will employment contract with Thumb. Pursuant to said contract, petitioner is compensated solely by Thumb and *does not receive any monetary compensation, reimbursements or benefits from the school district.* However, in his capacity as Principal of Hughes Elementary School, petitioner oversees the day-to-day operations of the school just as he did before retiring. Indeed, petitioner sits in the same office and has the same job responsibilities as before his retirement. Furthermore, petitioner is subject to the policies, rules and procedures of the school district in the performance of his duties as Principal of Hughes Elementary School.

After petitioner retired from the school district and while he held the position of Principal of Hughes Elementary School under his employment contract with Thumb, the school district was contacted by staff personnel from [defendant] the Michigan Public School Employees Retirement System [hereinafter "MPSERS"] regarding petitioner's employment status. The school district informed MPSERS that petitioner was working as the Principal of Hughes Elementary School under contract with Thumb.

Upon receipt of this information and after a review of MPSERS records showing that petitioner was a retiree working in the exact same capacity as he had prior to his retirement, MPSERS made a determination that petitioner was acting as an employee of the school district. This determination was based upon a 20-point control test contained in the Operations Manual produced by MPSERS and given to all school districts in the state. It is the same test used by the Internal Revenue Service [IRS] to make determinations as to whether individuals are employees or independent contractors.

Based upon the determination that petitioner was acting as an employee of the school district, Retiree Services Analyst Ben McIntire sent a letter to petitioner dated December 7, 1998 which stated, in relevant part, as follows:

"All retirees who return to public school employment are subject to post-retirement earnings limitations. . . .

"Your earnings [limit] in 1997 was $10,718.50. Your actual wages, as reported by the school system(s) you were employed by, were $30,816.00. You have exceeded your statutory limit by $20,097.50. Your pension in 1997 was $15,750.48. You must return to the Michigan Public School Employees Retirement System (MPSERS) the portion of your pension (up to the entire pension) that exceeded your limit: $15,750.48."

*          *          *

This same scenario applied in 1998 and 1999 as petitioner had exceeded the earnings limitation for those years also.

Petitioner did not return to MPSERS the pension monies he had received; rather, he requested an administrative hearing [before the Michigan Public School Employees' Retirement Board].

At the administrative hearing, petitioner maintained that the statutory limitation on earnings did not apply to him because he did not return to the school district as an employee. On September 14, 1999, the hearing referee issued her Proposal for Decision (PFD), recommending that petitioner's appeal be denied. Specifically, the PFD stated, in pertinent part:

Respondent utilizes a 20-point control test used by the Internal Revenue Service (Revenue Ruling 87-41) for determining the true nature of an employment relationship. . . .

*          *          *

. . . the 20-point test is instructive, and is applied in the following analysis.

Because Petitioner has served as principal for many years prior to his retirement, he requires very little direction and can be trusted to carry out his functions proficiently. Indeed, it was because of a concern about continuity in the face of several retirements that the system engaged the ser-

vices of Thumb and Petitioner. Nevertheless, he is required to follow school policies and procedures. The position of school principal is integral to and merged into the functioning of the school system. In other words, Petitioner's position is under the direction and control of the school superintendent and school board.

Petitioner's work hours are largely controlled by the official school year; i.e., work hours are set by the school system/employer. As a practical matter, Petitioner devotes his full time to the activities of school principal. Moreover, the employer provides him with an office, furniture, telephone and administrative support services, all on the employer's premises. Essentially, the only differences between Petitioner's current position and his former one are that he does not undergo a regular performance review, and he is not required to report each time he leaves the school building.

I concluded that, under the IRS 20-point test, Petitioner is an employee of the Essexville-Hampton Public Schools, and is therefore subject to the earnings limitations of the Act.

Petitioner filed exceptions to the PFD; however, following further review, respondent retirement board adopted the hearing referee's PFD in its entirety and, on November 29, 1999, issued an order denying petitioner's appeal. Petitioner appealed by right to the circuit court, which affirmed the retirement board's order. The court, relying on *Brouwer v Michigan Pub School Employee Retirement Sys*, unpublished opinion per curiam of the Court of Appeals issued 5/28/92 (Docket No. 131224),[1] in which this Court tacitly approved the use the IRS 20-point control test to determine the employment status of a retirant working for a school district, held that the retirement board did not err in its application of the 20-point

---

[1] Unpublished opinions of this Court are not precedentially binding under the rule of stare decisis. MCR 7.215(C)(1).

control test to the present circumstances, and that the board's decision was supported by competent, material, and substantial evidence on the whole record. On June 27, 2000, the circuit court issued its opinion and order affirming the decision of the retirement board that pursuant to § 61 of the retirement act, petitioner was "employed by a reporting unit," the Essexville-Hampton School District, and therefore subject to the earnings limitation of § 61 with regard to compensation received by petitioner for providing administrative services to the school district. Thereafter, this Court granted petitioner's application for leave to appeal.

II

On direct review of an agency decision, a trial court must determine whether the administrative action was authorized by law and whether the agency decision was supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; MCL 24.306(1); *Boyd v Civil Service Comm*, 220 Mich App 226, 232; 559 NW2d 342 (1996). Substantial evidence is any evidence that reasonable minds would accept as adequate to support the decision; it is more than a mere scintilla of evidence but may be less than a preponderance of the evidence. *Michigan Ed Ass'n Political Action Comm (MEAPAC) v Secretary of State*, 241 Mich App 432, 444; 616 NW2d 234 (2000). This Court's review of the circuit court's decision is, in turn, limited to a determination "whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's factual findings." *Boyd, supra* at 234. This

standard of review is indistinguishable from the "clearly erroneous" standard of review. *Id.* "[A] finding is clearly erroneous when, on review of the whole record, this Court is left with the definite and firm conviction that a mistake has been made." *Id.* at 235. See also *MEAPAC, supra* at 444; *Nat'l Bank of Detroit v Dep't of Social Services*, 240 Mich App 348, 354; 614 NW2d 655 (2000).

Statutory interpretation is a question of law we review de novo. *Haworth, Inc v Wickes Mfg Co*, 210 Mich App 222, 227; 532 NW2d 903 (1995). When construing a statute, the primary goal is to ascertain and give effect to the intent of the Legislature. *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 748; 641 NW2d 567 (2002). The first criterion in determining intent is the specific language of the statute. *Id.* The Legislature is presumed to have intended the meaning it has plainly expressed, and if the expressed language is clear, then judicial construction is neither required nor permitted, and the statute must be enforced as written. *Id.* When parsing a statute, this Court presumes that every word is used for a purpose. *Pohutski v City of Allen Park*, 465 Mich 675, 683; 641 NW2d 219 (2002). It is important to ensure that words in a statute are not ignored, treated as surplusage, or rendered nugatory. *Robertson, supra* at 748. Unless defined in the statute, every word or phrase of a statute will be ascribed its plain and ordinary meaning. *Id.*

III

Section 61 of the retirement act, MCL 38.1361, limits a retirant's retirement allowance when the retirant

"becomes employed by a reporting unit" and earns specified wages:

> (1) Except as otherwise provided in this section, if a retirant is receiving a retirement allowance other than a disability allowance payable under this act . . . on account of either age or years of personal service performed, or both, and *becomes employed by a reporting unit*, the following shall take place:
>
> \*     \*     \*
>
> (b) The retirant's retirement allowance shall be reduced by the lesser of the amount that the earnings in a calendar year exceed the amount permitted without a reduction of benefits under the social security act, chapter 531, 49 Stat. 620, or ⅓ of the retirant's final average compensation. For purposes of computing allowable earnings under this subdivision, the final average compensation shall be increased by 5% for each full year of retirement.
>
> (2) The retirement system may offset retirement benefits payable under this act against amounts owed to the retirement system by a retirant or retirement allowance beneficiary. [Emphasis added.]

As a preliminary matter, we note there is no dispute that the Essexville-Hampton Public Schools constitute a "reporting unit"[2] for purposes of this legislation and that petitioner's postretirement benefits collected, wages earned, and attendant limitations are as calculated and set forth by the hearing referee and recited by the circuit court. Moreover, as it was presumed and not at issue below, we assume without deciding that the school district has the statutory authority to contract with a private sector corporate

---

[2] " '[R]eporting unit' means a public school district . . . having employees on its payroll who are members of this retirement system. The reporting unit shall be the employer for purposes of this act." MCL 38.1307(3).

entity to provide administrative services such as those provided by petitioner through Thumb. See, generally, MCL 380.11a(3)(d) and (4); MCL 380.1229(2).

Relevant to the present appeal is that portion of § 61 that places limits on a retirant's retirement allowance when the retirant "becomes employed by a reporting unit" and earns specified wages. Specifically, the central question is whether petitioner was "employed by a reporting unit," the Essexville-Hampton Public Schools, or employed by Thumb, a private-sector personnel-services corporation supplying administrators and staff to the Essexville-Hampton Public Schools pursuant to a contract between the school district and Thumb. Using the IRS 20-point control test to determine petitioner's employment status, the hearing referee, the retirement board, and the circuit court all concluded that despite his at-will employment contract with Thumb, the school district actually employed petitioner. Consequently, petitioner was ordered to reimburse the MPSERS for monies obtained in excess of the earnings limitations of § 61.

Petitioner's primary claim on appeal is that he is not subject to the § 61 earnings limitation because he is employed by Thumb, not the school district. Petitioner maintains that the retirement board and the circuit court should not have utilized the IRS 20-point control test[3] to determine that he was "employed by a reporting unit." Petitioner contends that this test is designed to determine one's status as either an employee or independent contractor. Because petitioner has never characterized himself as an indepen-

---

[3] This test is also known as the "20 factor test."

dent contractor, but rather as an employee of Thumb, he argues that it is inappropriate to apply the test under the circumstances. Petitioner further asserts that in the absence of a statutory definition of the word "employed" as that word is used in § 61, the retirement board and the circuit court should have given "employed" its plain and ordinary meaning rather than resorting to the IRS 20-point control test. Petitioner argues that he is an employee of Thumb in any ordinary sense of the word: his contract is with Thumb, his W-2 wage reports come from Thumb, his compensation is from Thumb, he receives no benefits from the school district, and his tenure rights ended on retirement. This evidence purportedly establishes that the school district did not employ him. In addition, petitioner argues that the circuit court improperly relied on this Court's unpublished decision in *Brouwer*, *supra*, because it is without precedential value and is factually distinguishable.

On the other hand, respondents, while acknowledging that petitioner entered into an at-will employment contract with Thumb, nonetheless argue that petitioner was a de facto employee of the school district for purposes of § 61 of the retirement act. Respondents maintain that "[t]he fact that Mantei went through a placement agency for school administrators and teachers to return to his old job, rather than contracting directly with the School District, is . . . a distinction without a difference." Respondents contend that for all intents and purposes, and on the basis of the amount of control the school district exercised over his work, petitioner is "employed by a reporting unit" within the meaning of the statute.

To the extent petitioner argues that absent a statutory definition we should assign the phrase "*employed by a reporting unit*" its plain and ordinary meaning, petitioner's argument is overly simplistic. As this Court has repeatedly recognized when interpreting the terms "employ," "employer," or "employee" in different statutory and factual contexts, the existence of an employment relationship is typically determined by examining a number of factors. Consequently, depending on the circumstances, our governmental agencies and courts have developed different tests to ascertain the true nature of an employment relationship. In the instant case, as admitted into evidence below, the written criteria respondent MPSERS used to determine an employment relationship acknowledge that there are various tests for such determinations, but that "MPSERS generally relies upon the Common Law Control Test and the IRS' 20 Factor Test' . . . ." With regard to the latter test, the written criteria explain that

[i]n deciding whether an individual is an employee, and therefore subject to withholdings for income tax, FICA (Federal Insurance Contribution Act) and FUTA (Federal Unemployment Tax Act) contributions, the IRS applies a 20 factor test. These factors largely revolve around the amount of control an entity has over the work of the alleged independent contractor. The greater the degree of control the reporting unit has the right to assert, the more likely the IRS is to classify the worker as an employee.

The IRS uses these factors[4] to establish the employment status of independent contractors who claim to

---

[4] The twenty factors are: (1) actual instruction or direction of wage earner, (2) training, (3) integration of services, (4) services to be rendered personally, (5) hiring and supervision of assistants, (6) duration of rela-

be self-employed individuals and not employees of the organization or business where they are performing work. The degree of importance accorded each factor varies depending on the occupation and the factual context in which the services are performed. In essence, the test to be applied is the "control test," with the twenty factors serving as guides in determining whether an individual is an independent contractor or employee for taxation purposes.

However, we agree with petitioner that in the context of construing § 61 of the retirement act, the IRS 20-point control test does not provide the appropriate means of determining whether petitioner was "employed by a reporting unit." As noted above, the IRS ordinarily uses the 20-point control test to determine whether an individual is an employee or a self-employed independent contractor for purposes of determining income-tax filing and withholding requirements. Such circumstances are inapposite to the present situation where income-tax withholding considerations are not the paramount concern, and petitioner has never assumed the posture of a self-employed independent contractor. In other words, he has not contracted directly with the school district to provide his administrative services. See, generally, *Kamalnath v Mercy Memorial Hosp Corp*, 194 Mich App 543, 553; 487 NW2d 499 (1992). Instead, petitioner contracted with a corporate intermediary,

---

tionship, (7) hours of work, (8) full-time work; (9) place of work; (10) order of services, (11) submission of reports, (12) manner of payment, (13) payment of business expenses, (14) furnishing tools and materials, (15) investment in facilities, (16) profit or loss possibility, (17) working for a number of people, (18) availability of services to the public, (19) right to discharge, and (20) right to quit at any time.

Thumb, through which his services were provided to the school district.

Moreover, the written criteria used by respondent MPSERS indicates the element of control is the focal point of the IRS 20-point control test. However, this Court has eschewed the common-law "control test," of which the IRS 20-point control test is a variation, in cases that do not involve issues of respondeat superior and vicarious liability of an employer for the tortious acts of an employee. As this Court explained in *Chilingirian v Fraser*, 194 Mich App 65, 69; 486 NW2d 347 (1992), remanded 442 Mich 874 (1993), on remand 200 Mich App 198 (1993):

> The "control test" has been limited to those situations where respondeat superior has been alleged and the vicarious liability of a master is involved. *Nichol v Billot*, 406 Mich 284, 297; 279 NW2d 761 (1979); *Parham v Preferred Risk Mutual Ins Co*, 124 Mich App 618, 624; 335 NW2d 106 (1983). . . . Because vicarious liability of a master is not alleged herein, we find the control test to be inappropriate. *Nichol*, p 297. The test to be employed is one of "economic reality." *Goodchild* [*v Erickson*, 375 Mich 289, 293; 134 NW2d 191 (1965)].

See also *Kidder v Miller-Davis Co*, 455 Mich 25, 31-40; 564 NW2d 872 (1997); *Norris v State Farm Fire & Casualty Co*, 229 Mich App 231; 581 NW2d 746 (1998); *Hoffman v JDM Assoc, Inc*, 213 Mich App 466, 468-469; 540 NW2d 689 (1995); *Nichol, supra* at 297.

The economic-reality test considers four basic factors: (1) control of a worker's duties, (2) payment of wages, (3) right to hire, fire, and discipline, and (4) performance of the duties as an integral part of the employer's business toward the accomplishment of a common goal. *Clark v United Technologies Automo-*

*tive, Inc,* 459 Mich 681, 688; 594 NW2d 447 (1999); *Chilingirian, supra* at 69; *Parham v Preferred Risk Mut Ins Co,* 124 Mich App 618, 624; 335 NW2d 106 (1983). This test considers the totality of the circumstances surrounding the work performed. *Chilingirian, supra* at 69. No single factor is controlling and, indeed, the list of factors is nonexclusive and other factors may be considered as each individual case requires. *Clark, supra* at 689. Thus, the element of control, "although abandoned as an exclusive criterion upon which the relationship can be determined, is a factor to be considered along with payment of wages, maintenance of discipline and the right to engage or discharge employees." *McKissic v Bodine,* 42 Mich App 203, 208; 201 NW2d 333 (1972). Weight should be given to those factors that most favorably effectuate the objectives of the statute in question. *Id.* at 209.

Consistent with these authorities, we conclude in the instant case, where respondeat superior liability is not at issue, that the economic-reality test is the appropriate legal tool with which to assess whether petitioner was "employed by a reporting unit" under § 61 of the retirement act. The circuit court therefore failed to apply correct legal principles and erred in utilizing the IRS 20-point control test to determine petitioner's employment status.[5] *Boyd, supra* at 234.

---

[5] We find the facts of the instant case to be distinguishable from those of *Brouwer, supra.* Further, to the extent the *Brouwer* Court opined that the 20-point control test was similar to the economic-reality test and was the appropriate measure of the employment relationship therein for purposes of § 61 of the retirement act, we disagree with that decision and choose not to follow it. MCR 7.215(I)(1), MCR 7.215(C)(1).

III

Next, applying the economic-reality test to the facts at hand, we conclude that plaintiff was not "employed by a reporting unit" within the meaning of § 61. Conversely, plaintiff's status as Thumb's employee cannot reasonably be disputed under the circumstances.[6]

First, examining the element of control under the economic-reality test, the following facts are pertinent to our consideration of this factor. In June 1997, Thumb and the Essexville-Hampton Public Schools entered into a written contract whereby Thumb would provide the school district with a qualified individual, petitioner, to fill the position of principal of Hughes Elementary School. As consideration for the services and personnel Thumb provided, the school district agreed to pay Thumb a set sum. The contract could be terminated at any time with or without cause. It specified that "[t]he Agent provided by T.E.S. to the District shall comply with all established rules and regulations governing personnel within the District," and, in the event of any alleged breach of the agreement by the provided personnel, the district would promptly notify Thumb. Thumb, in turn, would take any necessary disciplinary action

---

[6] Plaintiff has attached to his brief on appeal letters from the Internal Revenue Service dated June 29, 2000, two days after the circuit court issued its ruling in this case, stating that for purposes of federal taxation plaintiff was an employee of Thumb. However, we must disregard these letters as part of the evidence of record. The IRS determination obviously post-dates the administrative and trial court proceedings; thus, it was not a part of the record below, and plaintiff never properly moved to enlarge the record in this Court. See MCR 7.216(A). In any event, the IRS determination relates to federal tax filing and withholding requirements, an issue apart from plaintiff's subjection to the earnings limitation of § 61 of the retirement act.

and advise the school district of such action. Petitioner's at-will contract with Thumb similarly provided that he would "comply with all published and applicable work rules and regulations of the District." Further, as noted by the hearing referee, petitioner's job responsibilities as principal of Hughes Elementary School were the same before and after his retirement. Petitioner spent most of his days at the school, interacting with parents and staff, communicating directly with the superintendent regarding day-to-day concerns, evaluating other school employees, and providing administrative reports to the school district. Moreover, the school district provided petitioner with an office, furniture, telephone, and support services, all on the school district's premises.

However, school superintendent Mark Gaubatz testified at the administrative hearing that he did not supervise or evaluate petitioner as he had when petitioner was an administrator employed by the school district before his retirement. Superintendent Gaubatz also testified that petitioner did not have an ongoing personnel file when providing services through Thumb, as he did when the school district directly employed him. There were no formal performance evaluations. Petitioner was not required to report to the school administration when leaving the building. Further, Gaubatz indicated that while he had the authority to discipline administrators the school district employed for any professional misconduct and performance deficiencies, any discipline of petitioner while providing services through Thumb was a responsibility of Mr. John Moore, the president of the company. Superintendent Gaubatz emphatically stated: "No, I do not supervise Mr. Mantei."

Thus, petitioner essentially exercised his independent professional judgment on a daily basis without direct supervision. The fact that petitioner was contractually bound to follow the rules and regulations of the school district and implement district policies does not lead to the inevitable conclusion that the school district had the right to control his work. Our conclusion in this regard is bolstered by another decision of this Court, albeit in a different context. In *Rambus v Wayne Co General Hosp*, 193 Mich App 268; 483 NW2d 455 (1992), aff'd on rehearing, 197 Mich App 480 (1992), this Court determined that a doctor could not assert the protections of governmental immunity because the doctor was an employee of a private corporate entity, University Medical Affiliates, P.C., and not an employee of Wayne County General Hospital, a government institution. In reaching the conclusion that the doctor was not an employee of the hospital, this Court noted:

> The hospital did not have the right to exercise control or direct the methods by which the UMA [University Medical Affiliates, P.C.] physicians performed their work and functions, except that the physicians generally agreed to comply with the policies, rules, and regulations of the hospital. Dr. Liss asserts that because he agreed pursuant to the contract to fulfill certain obligations to the hospital and because he was bound by the hospital's rules and regulations, he should be considered an employee of both UMA and the hospital. Although we agree with Dr. Liss that the physicians were obligated pursuant to the contract to perform certain duties and act within hospital guidelines, the fact remains that the hospital did not have any right to control the method or manner by which the physicians performed their work or fulfilled their obligations. In addition, no rule or regulation has been provided that would enable

the hospital to dictate the method of work utilized by a physician. Dr. Liss was not the hospital's employee. [*Id.* at 271.]

This rationale applies to the instant case. Although petitioner was obligated to follow the school district's rules and regulations, he nonetheless retained autonomy regarding the method and manner by which he fulfilled his obligations, thus undermining respondent's argument that the school district exercised control over petitioner and therefore "employed" him. Petitioner's job responsibilities certainly suggest that he was an agent of the school district with regard to business matters; however, whether petitioner could be considered the district's agent is not dispositive of the issue whether he was *employed* by the school district. See *Saums v Parfet,* 270 Mich 165, 171-172; 258 NW 235 (1935); *Lincoln v Fairfield-Nobel Co,* 76 Mich App 514, 519; 257 NW2d 148 (1977).

In any event, even if we assume arguendo that the school district had some control over petitioner through its contract with Thumb, the ability to control is only one factor to consider under the economic-reality test, and the totality of the circumstances indicate that petitioner was not "employed by a reporting unit."

It is significant to note that from the standpoint of compensation, petitioner's financial relationship with the Essexville-Hampton Public Schools changed significantly on his retirement. Thus, Thumb was not merely a conduit through which petitioner and the school district maintained a financial status quo. The record indicates Thumb paid all compensation for petitioner's services as principal of Hughes Elementary School while he was under contract with them, which is reflected in his W-2 wage and tax statements

for 1997 and 1998. Petitioner, under his last preretirement contract of employment as an administrator assigned to Hughes Elementary School, was paid a salary of $62,733, $2,000 for longevity service, and other fringe benefits. He received only $20,441 in gross compensation from Thumb as reflected on his 1997 W-2 wage form, and $26,559 gross compensation as noted on his 1998 W-2 wage form. Unlike his preretirement status, petitioner received no compensation, benefits, or other amenities in any form, including reimbursement of mileage or conference expenses, from the school district.

With regard to the third factor of the economic-reality test, the right to hire, fire, and discipline, the evidence showed that petitioner was directly accountable to John Moore, and that Thumb handled all disciplinary issues. Obviously, the school district could indirectly request that Thumb discipline or remove an unsatisfactory worker. However, it is undisputed that petitioner had an at-will contract of employment with Thumb. Such an arrangement is significantly different from the employment relationship of an administrator under an individual contract of employment with a public-school district under the Revised School Code, MCL 380.1229(2) and (3), by which statutory, nonrenewal procedures are required to terminate the services of an administrator other than the superintendent. Public-school administrators, if excluded from acquiring tenure in the administrative position, acquire tenure as classroom teachers and have the right to be retained in a position as a classroom teacher on nonrenewal of their administrative contracts of employment. This tenure right is specified in Article III, § 1(6) of the Michigan teacher tenure act,

MCL 38.91(6). See *Dodge v Saginaw Bd of Ed*, 384 Mich 346; 183 NW2d 793 (1971); *Goodwin v Kalamazoo Bd of Ed*, 82 Mich App 559; 267 NW2d 142 (1978). This statutory job security ceased when petitioner retired from the Essexville-Hampton Public Schools after thirty years of service.

Finally, while we conclude that the work petitioner performed was part of a common objective integral to the business of the school district, *Clark, supra* at 688, our analysis of the totality of the circumstances would be incomplete without reference to the contracting parties' own characterization of the employment relationship, as set forth in their written agreement. The contract between Thumb and the school district stated:

> The parties hereto agree that T.E.S. [Thumb] shall be an independent contractor in the performance of this Agreement and shall not act as Agent or representative of the District.
>
> It is further understood and agreed that the individual provided to the District by T.E.S. shall be and remain an employee of T.E.S. during the term of this Agreement. The agent provided to the district by T.E.S. shall not be considered to be an employee of the District for any purpose.
>
> T.E.S. shall pay all salaries, wages, benefits, payroll and other taxes to or on account of such employee arising out of or resulting from services performed pursuant to this Agreement. The District shall not be liable for the payment of any such salaries, wages, benefits, payroll or other taxes to or on account of any such employee.

Certainly, the parties' designation of roles and responsibilities may be motivated by their own self-interests and thus should not be regarded as dispositive in and of itself; nonetheless, the employment agreement is yet another relevant factor to be consid-

ered in examining the totality of the circumstances. *Kidder, supra* at 46; *McKissic, supra.* In this instance, it is clear that the school district and Thumb intended that petitioner "shall not be considered an employee of the District for any purpose." This language demonstrates a legitimate intent to mirror the economic reality of the situation—the economic reality that cost savings induced the school district to use intermediaries such as Thumb. Superintendent Gaubatz testified that the decision to contract with Thumb was the result of several factors, in particular the school district's financial difficulties and lack of continuity due to three principals leaving the system at the same time. The intended employment arrangement provided a method of remedying a persistent labor shortage and provided flexibility to fill vacancies in administrative positions in a manner favorable to the financially strapped school district.

In summary, we hold that application of the economic-reality test to the facts in this case compels the conclusion that petitioner was not employed by the school district, and therefore was not "employed by a reporting unit" within the meaning of § 61 of the retirement act. When the record before the retirement board in this matter is reviewed as a whole, it is evident that the circuit court "grossly misapplied the substantial evidence test to the agency's factual findings," *Boyd, supra* at 234, and clearly erred in its determination that petitioner was employed by the Essexville-Hampton Public Schools after his retirement because he provided administrative services to the school district pursuant to an at-will contractual arrangement with Thumb. On the contrary, the evidence of record clearly indicates that under the appli-

cable economic-reality test, petitioner has been an employee of Thumb since August 1, 1997, following his retirement. As an employee of Thumb, petitioner was not "employed by a reporting unit" of respondent MPSERS and was not subject to the earnings limitation of § 61 of the act. Consequently, he was entitled to all of the retirement benefits paid to him during the period in question, without deduction.

V

Given our resolution of this issue and our conclusion that the trial court erred as a matter of law in applying the IRS 20-point control test to the present circumstances, we need not address petitioner's remaining issues challenging the use and constitutionality of the IRS 20-point control test. Appellate courts should avoid deciding constitutional issues where the case may be decided on other grounds. *People v Riley*, 465 Mich 442, 447; 636 NW2d 514 (2001); *Rinaldi v Livonia*, 69 Mich App 58, 69; 244 NW2d 609 (1976) ("We will not undertake a constitutional analysis when we can avoid it.").

Finally, petitioner contends that he is entitled to costs and fees pursuant to MCL 24.323(1) and MCL 600.2421d because respondent MPSERS's attempt to apply the § 61 earnings limitation to him constituted a frivolous position. Petitioner's argument is without merit. The decisions of the retirement board and circuit court make it readily apparent that respondent's position was not frivolous. See *Widdoes v Detroit Pub Schools*, 218 Mich App 282, 290; 553 NW2d 688 (1996).

Reversed.